# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| CITY OF SAN ANTONIO, TEXAS; | § | |
| REY A. SALDAÑA,  in his official capacity | § | |
| As San Antonio City Councilmember; | § | |
| TEXAS ASSOCIATION OF CHICANOS | § | |
| IN HIGHER EDUCATION; | § | |
| LA UNION DEL PUEBLO ENTERO; | § | |
| and WORKERS DEFENSE PROJECT, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | Civil Action No. 5:17-cv-489 |
| v. | § | |
| | § | |
| THE STATE OF TEXAS; | § | |
| GREG ABBOTT; sued in his official | § | |
| capacity as Governor of the State of | § | |
| Texas; KEN PAXTON, sued in his | § | |
| official capacity as Attorney General | § | |
| of Texas, | § | |
| | § | |
| *Defendants*. | § | |
| | § | |

## I.      INTRODUCTION

1.      On May 7, 2017, Texas Governor Greg Abbott signed into law Senate Bill 4 ("SB 4"). While purporting to protect the State of Texas from the negative impact of undocumented immigration, SB 4 robs local jurisdictions of their ability to supervise officers and ensure public safety, and coerces law enforcement to dedicate limited resources to a job that is supposed to be performed and funded by the federal government. SB 4 forbids local governments and their employees from adopting, enforcing, and even endorsing policies that "prohibit or materially limit the enforcement of immigration laws." The impact of SB 4 will be devastating to Texas local governments and institutions of higher education because it hijacks their authority to enact

policies that best fit their localities' unique needs.

2. SB 4 imposes draconian monetary, civil, criminal, and ouster penalties on "local entities,"[1] "campus police departments,"[2] local officials and employees if they depart from the legislation's newly created immigration rules—even though Congress has occupied the field of immigration enforcement and compliance with SB 4 would subject municipalities and colleges to liability for violating the constitutional rights of Texans. Plaintiffs City of San Antonio, San Antonio City Councilmember Rey A. Saldaña, Texas Association of Chicanos in Higher Education ("TACHE"), La Union Del Pueblo Entero ("LUPE"), and Workers Defense Project ("WDP") (collectively, "Plaintiffs") seek a declaration that SB 4 is unconstitutional and an injunction against its implementation because it violates the Supremacy Clause, Contracts Clause, and the First, Fourth, and Fourteenth Amendments of the United States Constitution, as well as Section 2 of the Voting Rights Act of 1965.

## II. JURISDICTION AND VENUE

3. This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Plaintiff's causes of action under the laws of the Constitution of the United States. This Court has original jurisdiction over Plaintiffs' request for declaratory and injunctive relief under 28 U.S.C §§ 2201 and 2202. Venue is proper in this District under 28 U.S.C. § 1391 (b).

---

[1] SB 4, Section 1.01, Subchapter C, Section 752.051, subd. (5), defines "local entities" as:
"(A) the governing body of a municipality, county, or special district or authority, subject to Section 752.052; (B) an officer or employee of or a division, department, or other body that is part of a municipality, county, or special district or authority, including a sheriff, municipal police department, municipal attorney, or county attorney; and (C) a district attorney or criminal district attorney." S.B. 4, 2017 Leg., 85th Sess. (Tx. 2017).
[2] SB 4, Section 752.051(1), defines "campus police department" as "a law enforcement agency of an institution of higher education." The Texas Education Code defines "Institution of higher education" as "any public technical institute, public junior college, public senior college or university, medical or dental unit, public state college, or other agency of higher education as defined in this section." Tex. Educ. Code Ann. § 61.003(8) (West 2012).

### III.   PARTIES

4.      Plaintiff City of San Antonio is a home rule municipality organized under the laws of the State of Texas and is located in Bexar County, Texas. San Antonio has the constitutional and statutory authority to set policies and regulations, and to administer health and social service programs for its residents, including those residents that are immigrants.

5.      San Antonio is the seat of government for its public officials who face the injury of removal from office for "endorsing" or adopting policies that violate SB 4. San Antonio faces injury in fact from SB 4 in the form of substantial civil penalties for non-compliance with the law, and the associated budget uncertainty as a result of those penalties and the costs associated with training its police officers and administrative staff on federal immigration law. San Antonio faces mandamus and injunction for violating SB 4. Due to SB 4's provision that mandates compliance with all immigration detainers, San Antonio faces liability for violating the Constitutional rights of its residents and non-residents detained in San Antonio.

6.      Plaintiff Rey A. Saldaña is a San Antonio City Councilmember for District 4. Section 752.0565 of SB 4 allows for the removal of elected officials for "endorsing" policies that "materially limit" the enforcement of immigration laws. This provision is undefined and unduly vague and could encompass Councilmember Saldaña's political speech, including speaking publicly against SB 4 itself and current federal immigration laws and policies, and introducing legislation that would limit SB 4. Councilmember Saldaña faces removal from his elected office for speaking critically of SB 4, calling for its repeal, or criticizing federal immigration enforcement practices. SB 4 additionally greatly diminishes Councilmember Saldaña's ability to fully and adequately represent the needs of his constituents. Councilmember Saldaña was elected by his constituents to advocate on their behalf, including advocating for policies that may violate

SB 4. SB 4 causes Councilmember Saldaña actual and imminent harm.

7.      Plaintiff Texas Association of Chicanos in Higher Education ("TACHE") is a statewide professional association committed to the improvement of educational and employment opportunities for Latinos and Chicanos in higher education. TACHE's members include administrators, counselors, professors, staff, and students at four-year and community college campuses, as well as institutional members such as community colleges and universities throughout Texas. TACHE members will be injured by SB 4 and TACHE will be injured as an organization by SB 4.

8.      Plaintiff La Union Del Pueblo Entero ("LUPE") is a community union that provides social services and English classes and helps communities organize to advocate for better living conditions. LUPE has over 8,000 members throughout the Texas Rio Grande Valley. Most of LUPE's members are Latino and some are immigrants who are not authorized to be present in the United States. LUPE members will be injured by SB 4, and LUPE will be injured as an organization by SB 4.

9.      Plaintiff Workers Defense Project ("WDP") is a membership-based organization that works to enable low-income workers to achieve fair employment through education, direct services, and strategic partnerships. Many of WDP's members are Latino, and some are immigrants who are not authorized to be present in the United States.  WDP members will be injured by SB 4, and WDP will be injured as an organization by SB 4.

10.      Defendant the State of Texas is a political subdivision subject to the United States Constitution.

11.      Defendant Greg Abbott is Governor of Texas. Defendant Abbott is sued in his official capacity. Defendant Abbott is the chief executive officer and the chief law enforcement

officer of the State of Texas. Defendant Abbott is responsible for ensuring that the laws of Texas are faithfully executed, including the provisions of SB 4.

12.     Defendant Ken Paxton is the Attorney General of the State of Texas. Defendant Paxton is the officer who may seek mandamus or injunction to force compliance with SB 4. He is also the State officer given the sole authority to seek a *quo warranto* or a removal action against a public official who has violated SB 4. Defendant Paxton is sued in his official capacity.

## IV.     FACTUAL ALLEGATIONS

### A.     <u>Federal Immigration Scheme</u>

13.     The Immigration and Nationality Act ("INA") governs immigration to and citizenship in the United States. The INA is codified under Title 8 of the United States Code.

14.     Unauthorized presence in the United States, by itself, is a civil offense, not a criminal offense. *Arizona v. United States*, 132 S.Ct. 2492, 2499 (2012).

15.     Federal immigration law imposes no obligation on local jurisdictions to ask about immigration status or otherwise to enforce immigration law.

16.     8 U.S.C. § 1373(a) provides that:

> "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual."

17.     8 U.S.C. § 1373 does not require state or local government officials to collect information regarding the immigration status of individuals. At most, it bars policies that prohibit local entities from sending such information in their possession to federal officials. It does not,

however, require the disclosure of immigration status,[3] nor mandate cooperation with U.S. Immigration and Customs Enforcement ("ICE") detainers.

18.     Neither Section 1373 nor any other provision of federal law contains a penalty for non-compliance with Section 1373.

19.     Nevertheless, even so-called "sanctuary" policies comply with Section 1373, because although "sanctuary" policies generally restrict local law enforcement officers' ability to ask about an individual's immigration status, they do not restrict law enforcement's ability to send information to federal officials.

20.     ICE officers have authority pursuant to 8 C.F.R. § 287.7 to issue immigration detainers to "any other Federal, State, or local law enforcement agency…. The detainer is a request that such agency advise [ICE], prior to the release of the alien, in order for [ICE] to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible." 8 C.F.R. § 287.7(a).[4]

21.     8 U.S.C. § 1226(a) requires that ICE obtain a "warrant issued by the Attorney General" in order to arrest and detain an individual.

22.     8 U.S.C. § 1357(a)(2) creates a very limited exception to the warrant requirement for arrests.

---

[3] In a May 31, 2016 memorandum from the Inspector General of the U.S. Department of Justice, the Inspector General confirmed that Section 1373 "does not 'require' the disclosure of immigration status information." Memorandum from Michael E. Horowitz, Inspector General, to Karol V. Mason, Ass't Att'y Gen., Office of Justice Programs 5 n. 7 (May 31, 2016) (on file with author), *available at* https://oig.justice.gov/reports/2016/1607.pdf.

[4] The federal government cannot require states to comply with ICE detainers because such a mandate would likely violate the Tenth Amendment. *Galarza v. Szalczyk*, 745 F.3d 634, 643-645 (3rd Cir. 2014). ICE detainers are also not issued by judges and might not satisfy the probable cause requirements of the Fourth Amendment. *See, e.g., Miranda-Olivares v. Clackamas County*, No. 3:12-cv-02317-ST, 2014 WL 1414305, at *11 (D. Or. Apr. 11, 2014).

23.     Section 287(g) of the INA—codified at 8 U.S.C. § 1357(g)—enables state and local law enforcement to enter into agreements with ICE that authorize designated and trained local law enforcement officers to perform immigration-enforcement functions. Section 1357(g)(1) states that:

> "the Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law."

24.     In order to qualify under Section 287(g), state or local law enforcement officials must meet stringent criteria, at their own expense, including, but not limited to, adequate training on federal immigration laws. 8 U.S.C. § 1357(g)(2)–(6).

25.     Section 287(g) agreements limit federal immigration enforcement authority to those jurisdictions "determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States." 8 U.S.C. § 1357(g). Under Section 287(g) agreements, state and local law enforcement are trained and supervised by federal officials to exchange information and to perform federal immigration enforcement duties.

**B.      Texas Senate Bill 4**

26.     Section 1.01, Subchapter C, Section 752.051, amends Chapter 752 of the Texas Government Code to add definitions for the following terms: campus police department, immigration laws, institution of higher education, lawful detention, local entity, and policy.

27.     Section 752.051(2) defines "immigration laws" to mean "the laws of this state or

7

federal law relating to aliens, immigrants, or immigration" and includes SB 4 itself. SB 4 establishes a state scheme to enforce immigration law that is field-preempted because it intrudes into an area already occupied by Congress; and SB 4 is conflict-preempted because it is inconsistent with and undermines the federal immigration enforcement scheme.

28.     The inclusion of state laws in the definition of "immigration laws" implies that states like Texas may legislate in the area of immigration despite federal preemption. Therefore, what "state" immigration law means is unclear, and local officials and employees cannot be expected to understand how to comply with this part of the statute.

29.     Section 752.051(4), defines a "lawful detention" as "the detention of an individual by a local entity, state criminal justice agency, or campus police department for the investigation of a criminal offense." This definition fails to establish the minimum "reasonable suspicion" requirement for detention—even if only temporary—as established by *Terry v. Ohio*, 392 U.S. 1 (1968).

30.     Section 752.052, excludes the following entities from SB 4's statutory ambit: hospitals, religious organizations, school districts and charter schools, and the police commissioned by those entities; public health departments; and local mental health authority as defined by Health and Safety Code Section 531.002.

31.     Section 752.053(a) states that:

"[a] local entity or campus police department may not: (1) adopt, enforce, or endorse a policy under which the entity or department prohibits or materially limits the enforcement of immigration laws; (2) as demonstrated by pattern or practice, prohibit or materially limit the enforcement of immigration laws; or (3) for an entity that is a law enforcement agency or for a department, as demonstrated by pattern or practice, intentionally violate Article 2.251, Code of Criminal Procedure."

32.     Section 752.053(a) bans elected officials, local government employees, and campus police officials from endorsing policies that the state believes would prohibit or materially limit enforcement of immigration laws. Because the statute's definition of "immigration laws" includes state laws, including SB 4, the statute makes it unlawful for a campus police official or employee to call SB 4 unconstitutional or to advocate against its implementation. The definition of "immigration laws" is also broad enough to capture criticism of the INA and ICE enforcement practices and operations, and even the endorsement of policies that are different than those currently in place.

33.     Section 752.053(a) prohibits local entities and campus police departments from "endorsing a policy" that "prohibits or materially limits the enforcement of immigration laws". The phrase "endorsing" is not defined and is subject to a multitude of interpretations, including interpretations that would infringe on First Amendment rights.

34.     Section 1.01, Subchapter C, Section 752.053, subd. (b) states that:

"a local entity or campus police department may not prohibit or materially limit a person who is a commissioned peace officer described by Article 2.12, Code of Criminal Procedure, a corrections officer, a booking clerk, a magistrate, or a district attorney, criminal district attorney, or other prosecuting attorney and who is employed by or otherwise under the direction or control of the entity or department from doing any of the following:

(1) inquiring into the immigration status of a person under a lawful detention or    under arrest;
(2) with respect to information relating to the immigration status, lawful or unlawful, of any person under a lawful detention or under arrest, including information regarding the person's place of birth:
    (A) sending the information to or requesting or receiving the information from United States Citizenship and Immigration Services, United States Immigration and Customs Enforcement, or another relevant federal agency;
    (B) maintaining the information; or

9

(C) exchanging the information with another local entity or campus police department or a federal or state governmental entity;

(3) assisting or cooperating with a federal immigration officer as reasonable or necessary, including providing enforcement assistance; or

(4) permitting a federal immigration officer to enter and conduct enforcement activities at a jail to enforce federal immigration laws."

35.     Section 752.053(b) purports to require local jurisdictions to enforce immigration law in ways not contemplated by the federal government. It establishes a state immigration scheme in which untrained and unsupervised police officers and other public employees can exercise unfettered discretion to inquire about immigration status and enforce immigration laws. Under this scheme, local governments are prohibited from training officers on enforcing immigration law or enacting internal guidance, such as a sensitive locations policy, because such guidance would be "limiting" enforcement of immigration law. Consequently, SB 4 creates a system under which each individual police officer exercises his or her own untrained and unsupervised discretion on how to enforce immigration laws.

36.     For example, Section 752.053(b)(3) prohibits local governments from prohibiting and limiting police officers from "providing enforcement assistance." This provision could result in police officers deciding *sua sponte* to carry out "enforcement assistance" in sensitive locations, such as schools and funerals, where federal immigration officers will not conduct enforcement. Also, absent a warrant, local law enforcement officers do not have probable cause to detain an individual beyond the time the individual would otherwise be released and thus cannot provide "enforcement assistance" in the form of detaining an individual for federal officers. Federal immigration warrants are executed by trained federal officers, and local law enforcement are only allowed to provide "enforcement assistance" under a Section 287(g)

10

agreement. Unless local jurisdictions are allowed to place limits on warrantless detentions, allowing local police officers to provide "enforcement assistance" as each officer determines will expose local entities and campus police departments to liability under the Fourth Amendment and will lead to violation of the rights of Texas residents.

37.     Section 752.053 also fails to sufficiently warn local entities and campus police as to what specific conduct is unlawful. The undefined phrase "adopt, enforce, or endorse a policy under which the entity or department prohibits or materially limits the enforcement of immigration laws" is so vague and overbroad that it does not provide local entities and campus police with enough information to understand what policies they are not allowed to adopt, endorse, or enforce. Whether or not a policy only minimally or materially limits is subjective and will result in enforcement that is arbitrary and not uniform.

38.     The phrases "assisting or cooperating with a federal immigration officer" are likewise too vague to give police chiefs enough information to know what they can and cannot prohibit their employees from doing. This language takes away a police chief's discretion to prioritize law enforcement objectives.

39.     SB 4 prohibits local jurisdictions from preventing police officers from inquiring about a detainee's immigration status, including place of birth. By forbidding municipalities and colleges from creating any limiting guidance—including guidance to prevent unconstitutional racial profiling—untrained and unsupervised local police officers will disproportionately detain foreign-born and Latino individuals, especially those that do not have a Texas driver's license.

40.     The penalty for violating Section 752.053 is between $1,000 and $1,500 for the first violation, and between $25,000 and $25,500 for each subsequent violation. Section 752.056.

41.     Failure to comply with Section 752.053 could additionally result in the

11

extraordinary penalty of removal from "elective or appointive office of a political subdivision" of the State of Texas. Section 752.0565.

42.     Section 752.0565 purports to remove from elective or appointive office individuals who "endorse a policy that materially limits the enforcement of immigration laws." This provision would drastically limit political speech and its content. The term "endorse" is unduly vague in that it reaches protected speech, and it is a viewpoint restriction that only prohibits a certain kind of speech. For example, a city councilmember like Plaintiff Councilmember Saldaña could potentially be removed from elected office for "endorsing" the repeal of SB 4, and elected and appointed officials could be prohibited from arguing in favor of (i.e. endorsing) policies that limit the enforcement of immigration law.

43.     Section 752.055(a) states that:

"(a) Any citizen residing in the jurisdiction of a local entity or any citizen enrolled at or employed by an institution of higher education may file a complaint with the attorney general if the person asserts facts supporting an allegation that the entity or the institution's campus police department has violated Section 752.053. The citizen must include a sworn statement with the complaint stating that to the best of the citizen's knowledge, all of the facts asserted in the complaint are true and correct."

44.     Section 752.055 allows "citizens" to file sworn complaints with the attorney general saying that a local jurisdiction or campus police department is violating Section 752.053. The attorney general can then sue the jurisdiction for injunctive relief to force compliance.

45.     Section 1.02, Section 772.0073, amends Chapter 772 of the Texas Government Code. Section 772.0073(a)(2) defines an immigration detainer request as:

"'Immigration detainer request' means a federal government request to a local entity to maintain temporary custody of an alien, including a United States Department of Homeland Security Form I-247 document or a similar or successor form."

46.     This definition of an "immigration detainer request" leaves room for other less formal requests, including a verbal or written request that falls short of a DHS Form I-247. This unduly broad definition allows for detainer requests that fail to satisfy due process requirements.

47.     Article 2, Section 2.01, Art. 2.251(a), amends Chapter 2 of the Texas Code of Criminal Procedure to add the following:

> "A law enforcement agency that has custody of a person subject to an immigration detainer request issued by United States Immigration and Customs Enforcement shall: (1) comply with, honor, and fulfill any request made in the detainer request provided by the federal government; and (2) inform the person that the person is being held pursuant to an immigration detainer request issued by United States Immigration and Customs Enforcement."

48.     Art. 2.251(a) requires that local law enforcement agencies comply with all ICE detainer requests, robbing local governments and colleges of their power to determine the scope of cooperation with such requests. SB 4 removes a local jurisdiction's discretion in opting not to comply with an ICE detainer due to potential Fourth Amendment liability, such as after bond was posted or when a habeas petition has been filed.

49.     This provision also grants local police greater power to conduct warrantless arrests than what is granted to ICE officers. 8 U.S.C. § 1357(a)(2) creates a very limited exception to the warrant requirement. The warrant exception allows ICE officers to make warrantless arrests only in situations when there is reason to believe that the individual is (1) not lawfully present, and (2) likely to evade detention by immigration officers before a warrant can be obtained. SB 4, on the other hand, compels warrantless arrests, via mandatory enforcement of immigration detainers, without any requirement that the detaining officer have reason to believe that the detainee is unlawfully present and likely to evade detention by immigration officers.

50.    Art. 2.251(b) states that:

"A law enforcement agency is not required to perform a duty imposed by Subsection (a) with respect to a person who has provided proof that the person is a citizen of the United States or that the person has a lawful immigration status in the United States, such as a Texas driver's license or similar government-issued identification."

51.    Section 5.01, Section 87.031, Sec. 39.07 amends the Local Government Code to add subsection (c) that creates "a misdemeanor involving official misconduct."

52.    Section 5.02, Chapter 39, Sec. 39.07, amends the Penal Code to add a Class A misdemeanor for a sheriff, chief of police, constable or person who has primary authority for administering a jail to knowingly fail to comply with an ICE detainer request issued concerning a person in his or her custody, unless the person in custody proves his or her lawful citizenship or immigration status.

53.    SB 4 imposes criminal liability for failure to enforce ICE detainers. Section 39.07 makes it a crime for a law enforcement official to refuse to enforce an ICE detainer because he has a good faith belief that the ICE detainer lacks the requisite probable cause required by the Fourth Amendment. This provision is unduly vague because it would potentially include detainer requests that were issued in error and requests that fail to satisfy constitutional requirements.

54.    SB 4 asks law enforcement officials to make determinations as to whether or not a person in custody can sufficiently prove "his or her lawful citizenship or immigration status." SB 4, Section 2.01, Art. 2.251. SB 4 fails to define "lawful immigration status," and it is not consistent with the federal definition and practice. For example, it is unclear whether local law enforcement is required to continue to detain someone with Deferred Action for Childhood Arrivals because that person has lawful presence, but not lawful immigration status. Allowing police officers to determine lawful immigration status is likewise problematic because a driver's

14

license does not prove "lawful immigration status." It is unclear what types of "similar government-issued identification" suffice to prove "lawful immigration status."

      C.    **Legislative History of SB 4**

55.    SB 4 targets immigrants and the communities in which they live for expanded law enforcement activities, despite the well documented economic contribution and lower crime rates of immigrants.

56.    Defendants have consistently characterized all undocumented immigrants who have encounters with local police as "dangerous criminals," and have also characterized the use of local discretion when dealing with immigrants as a threat to public safety. In an October 26, 2015 letter to Dallas County Sheriff Lupe Valdez, who had earlier announced a policy to honor ICE detainers on a case-by-case basis, Defendant Abbott warned: "Your refusal to fully participate in a federal law enforcement program intended to keep dangerous criminals off the streets leaves the State no choice but to take whatever actions are necessary to protect our fellow Texans."

57.    In January 2017, Travis County Sheriff Sally Hernandez announced she would honor ICE detainers only when a suspect was booked on charges from a list of the most serious crimes, i.e., capital murder, aggravated sexual assault, and "continuous smuggling of persons."

58.    The following month, in retaliation against Sheriff Hernandez's policy, Defendant Abbott cut approximately $1.5 million in state grant funds to Travis County. The grant funds were used to support programs related to family violence, veterans' court, juvenile court and programs in other areas of the criminal justice system. Defendant Abbott stated, "We are working on laws that will, one, ban sanctuary cities, remove from office any office holder who

promotes sanctuary cities and impose criminal penalties[,] as well as financial penalties."[5]

59.     On January 31, 2017, during his State of the State address to both chambers of the Texas Legislature, Defendant Abbott declared passing so-called "anti-sanctuary city" legislation as one of four emergency items.

60.     Because passing legislation in Texas is no easy feat, declaring a bill an emergency item makes it far more likely than non-emergency legislation to become law.  For example, although the rules of the Legislature prohibit legislators from voting on bills during the first 60 days of the 140-day session, lawmakers can vote on items declared emergencies by the Governor at any time during the legislative session.

61.     SB 4 was introduced in the Texas Senate on January 24, 2017. During the Senate floor debate on SB 4, the bill's author, Sen. Perry falsely claimed, "[M]y bill does not impact those that are here illegal [*sic*], undocumented that are providing work and food for their family as long as they don't commit a crime that they're hauled in where a detainer request occurs. That's all it applies to is the guys that break the law."

62.     During the legislative hearings on SB 4, witnesses from a broad range of political constituencies testified against the bill as immoral, dangerous, and unconstitutional. Witnesses, including Plaintiffs, testified that SB 4 would trample on local control, lead to racial profiling, harm the Texas economy, reduce cooperation between police and the communities they serve, and make Texas less safe.

63.     Texas business leaders opposed SB 4. The Texas Association of Business, the state's foremost employer organization, and over 100 businesses, the Texas Association of

_____

[5] *Abbott to Seek Laws to Remove Sheriff After ICE Detainer Policy Announcement*, KVUE.COM, Jan. 25, 2017, https://goo.gl/IRW0It.

Mexican American Chambers of Commerce, the San Antonio Hispanic Chamber of Commerce, and other local chambers of commerce wrote an open letter to the Legislature "opposing so-called sanctuary city legislation" as a threat to state business and economic interests.

64.     Local entities also feel a negative economic impact as a result of SB 4, which diverts precious resources, including personnel and professional development funds, away from the priorities they recognize as most urgent.

65.     Undocumented college students and their allies collected over 13,000 petition signatures against SB 4, stating that "Texas campuses like mine are now included in anti-sanctuary, anti-immigrant Senate Bill 4, running the risk of turning my university police department into federal immigration law enforcement. Something they are not trained to do."

66.     Sheriffs from Texas' largest metropolitan areas, including Plaintiff City of San Antonio, Dallas, Houston, El Paso, and Austin, wrote in a series of op-editorials published across the state that SB 4 would "perpetuate instability by making it impossible for us to effectively direct and manage our deputies" and "coerce local law enforcement to dedicate frequently scarce resources—such as jail-space, on-duty time of officers and local tax dollars—to a job that is supposed to be done and funded by the federal government."[6]

67.     Law enforcement executives also expressed concern that their officers would abuse SB 4. For example, Sheriff Salazar told the media that if SB 4 "is misapplied you could very easily cross the line into racial profiling." Likewise, San Antonio Police Chief William McManus told reporters that since an officer is not prohibited from inquiring about the immigration status of a person lawfully detained, "You can be asked for jaywalking, you can be

---

[6] *See, e.g.*, Sally Hernandez et al., Op-Ed., *Texas Sheriffs: SB 4 Burdens Law Enforcement, Local Taxpayers*, AMERICAN-STATESMAN, Apr. 18, 2017, https://goo.gl/2vReMO.

asked if you're deemed to be intoxicated in public. Any ordinance that is currently on the books that one may violate and you're stopped for, you can be asked for your immigration status."[7]

68.    SB 4, heard in the Senate State Affairs Committee on February 2, 2017, had less than 10 people register in support, over 1,000 people register against, and 332 testify against the bill during the 16-hour hearing that started at 8:30 a.m. and lasted until 12:51 a.m. the next day.

69.    At the beginning of the hearing, Senator Joan Huffman, chair of that Committee, assured the public that written testimony would be considered by the Committee. However, at the end of that Committee hearing, the Committee swiftly passed SB 4, without reviewing the 97 written testimonies submitted that day.

70.    The full Senate debated SB 4 on February 7, 2017 -- only two business days from its hearing in committee—and voted 20-11 to pass the bill. No legislator of color voted for the bill. Only 3 of the 33 amendments to SB 4 offered in the Senate by Latino senators were adopted.

71.    On March 15, 2017, the House State Affairs Committee heard over 10 hours of public testimony on SB 4. Over 465 people gathered to testify against the bill and only seven registered in support of it.

72.    House State Affairs Committee Chairman Byron Cook told the Texas Tribune that, after listening to the testimony, he thought the Committee could consolidate SB 4 to include only the provision requiring compliance with ICE detainer requests.[8]

73.    On April 20, 2017, the House State Affairs Committee sent SB 4 to the House Calendars Committee, which passed the bill out in less than one hour. SB 4 was placed on the

---

[7] Joey Palacios, *McManus, Sheriff Salazar Denounce Newly-Signed Sanctuary Cities Law*, TEXAS PUBLIC RADIO, May 8, 2017, https://goo.gl/XelPD4.

[8] Julián Aguilar, *Key Chairman Says House Will Take Its Time On "Sanctuary" Legislation*, TEX. TRIBUNE, Mar. 16, 2017, https://goo.gl/AqX1OF.

18

House Emergency Calendar and heard on the House floor on April 26, 2017. The House departed from procedural norms by suspending the rules to skip debate on 70 — almost half — of the 145 pre-filed amendments.

74.     When laying out the bill to the full House, SB 4's House sponsor Rep. Charlie Geren referred to undocumented immigrants as "illegals," despite having been told by Latino legislators and advocates how offensive that term was to the immigrant community.

75.     During the House floor debate Rep. Matt Schaefer brought back a key provision of the Senate's version of SB 4 through an amendment. The provision authorizes police to ask a person's immigration status not only when they are lawfully *arrested* but also lawfully *detained*. The "Schaefer amendment," or what many call the "show me your papers" provision, applies even to those lawfully detained as a result of an alleged traffic violation.  The House passed the "Schaefer amendment" 84-64, with only one Latino lawmaker voting in favor.  Multiple attempts to amend the "Schaefer amendment" to exempt vulnerable populations such as children, veterans, pregnant women, homeless individuals, and those in domestic violence shelters failed.

76.     SB 4 passed to second reading on a 93-54 vote on April 26, 2016.  The House passed SB 4 on third reading with a 94-53 vote the following day on April 27, 2016. Only three of the 36 Latino legislators voted for the bill.

77.     On May 3, 2017, the Senate moved to concur with the House amendments to SB 4. The next day, both chambers signed the bill and sent it to Defendant Abbott.

78.     Defendant Abbott signed SB 4 on May 7, 2017.

79.     SB 4 takes effect on September 1, 2017.

80.     The division fostered by the debate and passage of SB 4 stained the remainder of the Texas Legislative Session. On May 29, 2017, the last day of the Legislative Session, in

response to chanting in the House Gallery by peaceful, mostly Latino anti-SB 4 protesters, Texas Rep. Matt Rinaldi taunted Latino lawmakers, saying "I called ICE on all of them...They need to deport all these illegals." Rep. Rinaldi's statement implies an assumption that all of the members in the gallery were undocumented because they appeared to be "Latino."

81.    When reminded by Rep. Cesar Blanco that Rep. Rinaldi comes from an immigrant background, Rep. Rinaldi responded, "The difference between those people and my family is that my family loves America."

82.    On May 31, 2017, U.S. Immigration and Customs Enforcement confirmed that Rep. Rinaldi indeed made a report to ICE on the last day of the legislative session.[9]

### D.    Plaintiff San Antonio and Community Trust Policies in Texas

83.    The estimated 1.65 million undocumented persons in Texas comprise about 6 percent of the state's total population.[10] That includes between 114,000 to 194,000 children. An estimated 834,000 Texas children live with one or more undocumented parents.[11]

84.    Research, including a recent 2015 Cato Institute report, has steadily shown over the last few decades that immigrants are no more, and often less, likely to commit crimes than the U.S.-born population. In 2006, a report by the Texas State Comptroller on the economic impact of undocumented immigration showed that undocumented individuals produced more in state revenue than they received in state services and that the absence of the undocumented

---

[9] James Drew, *ICE Now Confirms That Texas Lawmaker Did Call About Protesters Monday*, Hous.Chron., May 31, 2017, https://goo.gl/Rq1KQf.
[10] Pew Research Center, *U.S. Unauthorized Immigration Population Estimates*, Nov. 3, 2016, https://goo.gl/HaNFh0.
[11] Capps, R., et. al. (2016). A profile of U.S. children with unauthorized immigrant parents. Table A-2. Washington, DC: MPI.

population would have resulted in a loss of billions of dollars to Texas' gross state product.[12] Since the release of the 2006 report, the Texas Legislature has not directed the Comptroller to study the economic impact of undocumented immigrants. However, for the last few legislative sessions, the Texas Senate has passed bills that would examine only the *costs* of undocumented immigrants, deliberately excluding any positive contributions of Texas' undocumented population.

85.     External researchers have helped to fill the void. Recent reports show consistent net economic benefits of undocumented workers in Texas; for example, a study by the Perryman Group estimated the total *net* economic benefits of undocumented workers in Texas at $663.4 billion in total expenditures and almost $290.3 billion in gross product each year. Their findings also estimated that undocumented immigrants create more than 3.3 million jobs when indirect and induced effects are considered.[13]

86.     To ensure public safety, and in recognition of both the economic value that immigrant communities bring and that they commit crimes at a lower rate, many cities and counties throughout and outside of Texas have decided to implement policies that limit when local police officers will inquire about an individual's immigration status. These policies encourage communities to, among other things, cooperate with law enforcement personnel to prevent, investigate, and solve crimes. These policies also promote public health by encouraging immigrants to seek healthcare when needed, including immunizations, and the policies protect

---

[12] *See* CAROLE KEETON STRAYHORN, OFFICE OF THE COMPTROLLER, UNDOCUMENTED IMMIGRANTS IN TEXAS: A FINANCIAL ANALYSIS OF THE IMPACT TO THE STATE BUDGET AND ECONOMY (2006), http://www.lrl.state.tx.us/scanned/SIRSI/C2600.8_UN2U_2006.pdf (last visited May 31, 2017).
[13] *See* The Perryman Group, *The Economic Benefits of the Texas Undocumented Workforce*, https://www.perrymangroup.com/wp-content/uploads/Perryman-Undocumented-Workforce-Infographic.pdf (last visited May 31, 2017).

the health and welfare of U.S. citizen children whose parents are undocumented. Because local government is primarily tasked with and best suited to address the needs of its community, cities and counties have implemented "community trust" policies to address the specific concerns of their communities. These policies not only foster trust in the local government and police, but they make communities safer because they encourage community policing. Colleges and universities similarly have adopted community trust policies to fulfill their mission of educating local students, and to ensure campus safety.

87.     Plaintiff San Antonio has an estimated 1.49 million residents and Latinos make up approximately 63% of those residents.[14] About 14% of San Antonio's population is foreign-born. There are an estimated 71,000 undocumented persons in Bexar County and an estimated 66,000 are of Mexican and Central American descent. An estimated 22,000 children in Bexar County live with one or more undocumented parent.[15]

88.     Immigrants play a significant role in the San Antonio economy. Although they comprise approximately 14.3 percent of the city's total metro labor force, immigrants make up a disproportionate number of the city's entrepreneurs and business owners (16.4%).[16] They are also self-employed at almost double the rate of San Antonio's native-born population (10.2% compared with 5.2%, respectively).[17] In relation to their native-born counterparts, immigrants power San Antonio's construction and food service industries. Their jobs are also heavily concentrated in the fields of education, health care, and social services.

---

[14] United States Census Bureau, *QuickFacts San Antonio city, Texas*, https://goo.gl/E9dwGp (last visited May 31, 2017).
[15] Migration Policy Institute, *Profile of the Unauthorized Population: Bexar County, TX*, https://goo.gl/TBkXE4 (last visited May 31, 2017).
[16] Center for Public Policy Priorities, *Immigrants Drive The San Antonio Economy*, March 2017, https://goo.gl/5ZDjEb.
[17] *Id*.

89.     As the Texas Association of Business noted in its anti-SB 4 letter to lawmakers, the "rich binational commerce from which Texas benefits is key to building our workforce and remaining competitive in a global marketplace." In San Antonio, Mexican nationals substantially contribute to the economy when they come to vacation, shop, visit family, or conduct business. For example, a 2012 report by the San Antonio Hispanic Chamber of Commerce showed that these visitors generated a spending output in Bexar County of $359,303,612, which supported over 3,974 jobs, incomes of $135,237,591, and an added $215,906,290 to the county's gross domestic product.[18] When other states have passed anti-immigrant legislation, they have faced backlash in the form of economic or travel boycotts of the entire state. Should that occur in Texas as a response to SB 4, the economic contributions from binational commerce will be jeopardized.

90.     The San Antonio Police Department ("SAPD") has a longstanding practice of cooperating with federal law enforcement, including in the execution of federal warrants, honoring immigration detainers requests, and allowing ICE officials into the Central Magistrate Office where detained individuals are processed. Police Chief William McManus cooperates with ICE but the scope of that cooperation must be at the Chief's discretion consistent with local law enforcement policy, objectives, and resource constraints. SAPD officers are neither trained nor adequately qualified to enforce the very complex federal immigration laws. SAPD fears that SB 4 will take away the discretion of its police chief to utilize resources in a way that is best for the San Antonio community, and that permitting local officers to assume immigration enforcement tasks without supervision will be detrimental to public safety.

---

[18] STEVE NIVIN, SABER RESEARCH INSTITUTE, THE SPENDING PATTERNS AND ECONOMIC IMPACTS OF MEXICAN NATIONALS IN A TWENTY-COUNTY REGION OF SOUTH AND CENTRAL TEXAS (2013), http://www.sahcc.org/wp-content/uploads/Mexican-Nationals-Report-FINAL.pdf.

91.     Persons arrested in Bexar County and San Antonio are taken to the City of San Antonio Detention Center ("Detention Center"). The Detention Center holds between 60,000 to 100,000 detainees a year.[19] Normally, detainees are allowed to bond out within 18 hours, or if they are not eligible to bond out, they are transferred to Bexar County Jail. ICE officers give written immigration detainer requests to the Office of The Division Chief of the County Magistrate Court. The City of San Antonio ("the City") does not let inmates subject to ICE detainers bond out, and holds them even if they paid their bond. The City holds detainees at the Detention Center for up to 18 hours under ICE detainers, and transfers those that are not picked up by ICE, with a copy of the ICE detainer attached to their file, to county jail. Due to concerns about public safety and overcrowding, the City does not hold detainees with only Class C misdemeanors under ICE detainers, but by agreement ICE will assume immediate custody of persons charged with Class C offenses. Prior to January 2017, ICE very rarely placed detainers on individuals charged with Class C misdemeanors.

92.     Despite San Antonio's cooperation with ICE, San Antonio fears it will be prosecuted for violating SB 4 because of its modest restrictions on ICE's access to its detainees.

93.     Although San Antonio does not consider itself a "sanctuary jurisdiction," since November 2015 it has had a policy (Procedure 618.11 – Racial/Bias Profiling/Immigration Policy) that instructs its police officers to neither question the immigration status of those arrested nor detain individuals solely on the basis of their immigration status. It also prohibits officers from making decisions regarding immigration status and deportability. In order to protect public safety, San Antonio's police officers work to cultivate an environment where

---

[19] The Detention Center spends about $3 million a year and $52/day per inmate on medical care, food, and administrative and judicial costs.

everyone, regardless of immigration status, feels comfortable interacting with police officers—whether supporting law enforcement or seeking their assistance. The Police Department's primary mission is to work with the community to help prevent and investigate crime. San Antonio is convinced that the immigrant community will no longer cooperate with police to the extent they did before SB 4 passed and that SB 4 will discourage immigrants from reporting crimes and participating in health and social service programs, such as WIC. San Antonio also fears that SB 4 will lead to unlawful racial profiling of its immigrant and Latino community.

94.     To foster a community of trust with San Antonio's immigrant and Spanish-speaking community, in January 2015, the San Antonio Police Department started the UNIDOS program. UNIDOS is a community policing initiative that focuses on the Spanish-speaking and immigrant community and that involves meetings to discuss topics such as crime prevention, immigration, and cultural differences between norms in the United States and the home countries of various immigrant groups.

95.     San Antonio does not want SB 4 to undo the many years that SAPD has spent working towards a community policing model.

96.     In addition to public safety concerns, cities, counties, and colleges worry about the financial costs of having their local police enforce federal immigration laws. SB 4 will force municipalities to expend their own limited resources such as jail-space, on-duty time of officers and local tax dollars to a job that is supposed to be performed by the federal government and paid for with federal dollars. Many jurisdictions, including San Antonio, simply do not have the public safety resources or flexibility in their budget to task their officers with the additional responsibility of enforcing federal immigration law.

97.     Chief McManus said SB 4 would not only override the City's policies, it is

racially discriminatory. During a press conference, Chief McManus said, "Anyone that's under arrest, anyone that is lawfully detained on the street will be subject to be questioned about their immigration status…If I stopped you on the street . . . and I talked to you, I might ask you for your papers. You have an accent, you're darker complected than I am, does that mean you're not legal? According to [SB 4], it might. It absolutely is profiling."[20]

98.     On February 2, 2017, Chief McManus testified against SB 4 before the Senate State Affairs Committee, stating that:

> "San Antonio is not a 'sanctuary city.' However, I have some serious concerns with [SB 4] and the impact it would have on our primary duty, which is to handle calls for service and work with the San Antonio community to improve the quality of life in their neighborhoods. This bill would require local law enforcement to verify immigration status. Immigration laws are complex. Officers have no training on immigration law, and it would detract us from our primary mission. Our mission is to create a safe environment and reduce crime, a task that requires appropriate allocation of funding and complete discretion for police chiefs to direct their officers. I'm concerned that the bill would take away from the discretion of local police chiefs to utilize resources in a way that is best for their communities and that the addition of immigration enforcement duties would actually be detrimental to the public safety. The trust San Antonio has built up with the whole community is integral to our ability to investigate, prevent, and solve crime. Our main concern is that the bill will erode this trust, which will affect crime reporting and investigations as many, many people would be less likely to speak to the police out of fear of deportation…. SB 4 would detract from local law enforcement's effectiveness."[21]

99.     Chief McManus also told the Senators that SB 4 "usurps the authority of police chiefs to direct their departments." He said: "We simply do not have the capacity to handle immigration laws as well as enforcing the laws of the Penal Code.... It wouldn't be cheap."[22]

---

[20] Kelsey Bradshaw, *SAPD Chief Mcmanus, Julián Castro Speak Out Against Texas SB 4 Call It 'Profiling'*, Chron, Apr. 27, 2017, https://goo.gl/H2dQ0r.
[21] *Hearing on S.B. 4 Before the S. Comm. on State Affairs*, 2017 Leg., 85th Sess. (Tx. 2017) (statement of William McManus, Chief of Police, San Antonio Police Dep't).
[22] *Hearing on S.B. 4 Before the S. Comm. on State Affairs*, 2017 Leg., 85th Sess. (Tx. 2017)

100.     Similarly, during the House State Affairs Committee hearing on March 15, 2017,

Assistant Chief of Police Anthony Treviño testified against SB 4 stating:

> "This bill will undermine the relationship that San Antonio Police Department has
> forged with communities it is protecting by creating fear within the most
> vulnerable segments of our population and discouraging victims of crime from
> communicating with law enforcement.... Requiring law enforcement agencies to
> enforce immigration law will keep officers from performing their primary duties,
> which is to protect residents of San Antonio which will be detrimental to the
> relationship between communities and police departments. I firmly believe that,
> as law enforcement officers, we have a fundamental responsibility to protect all
> people from harm, regardless of what their status is...Chief McManus and I share
> over 60 years of law enforcement experience and, based upon that experience and
> established best practices and feedback from city leadership and from the
> community, the Chief is best equipped to determine the policies that direct
> officers on how they serve the citizens of our community.... We are concerned
> with any legislation that would limit the chief's authority to have a policy that
> bars officers from inquiring about the immigration status of individuals they come
> into contact with.  It's evident that SB 4 will limit the ability of the San Antonio
> Police Department and law enforcement agencies throughout the state to
> effectively protect the communities that they serve by eroding the public trust
> between the law enforcement community and the communities that we serve."

### E.     SB 4 Harms Plaintiffs WDP, LUPE, TACHE, And Their Members

101.     Plaintiffs LUPE and WDP fear for the well-being of their vulnerable members

who could be stopped, detained, arrested, questioned, and transferred to custody of federal

immigration agents, under SB 4's provisions. LUPE and WDP believe that undocumented

individuals will be deterred from seeking legal help from and participating in advocacy efforts

with LUPE and WDP because of SB 4. LUPE and WDP additionally fear that their members'

constitutional rights could be violated due to mandatory enforcement of immigration detainers,

being unlawfully detained and questioned about their immigration status, and being racially

profiled because of their Latino heritage.

102.     Plaintiff TACHE fears that its members will be subject to prosecution under SB 4.

---

(statement of William McManus, Chief of Police, San Antonio Police Dep't).

In particular, TACHE fears that its faculty and staff members could be prosecuted for speaking out against or being critical of SB 4 and of federal immigration enforcement policies. A central tenet of higher education is the ability for students, staff, and faculty to engage in analysis and critique of current affairs. TACHE fears that the vague, sweeping provisions of SB 4 that prohibit "endorsing" policies that "prohibit or materially limit the enforcement of immigration laws" will deter its members from exercising their First Amendment rights and from doing work that is crucial to their roles as educators and administrators, i.e., engaging their students in discussions that may be critical of SB 4 and federal immigration policies. In addition, TACHE fears that its undocumented members will be deterred from attending classes and campus events because of fear of being questioned by campus police about their immigration status. TACHE also fears that its members could be subject to racial profiling and unlawful detentions because of their Latino heritage, and that they could have their constitutional rights violated due to mandatory enforcement of immigration detainers.

## V.    SB 4 IS CAUSING IMMEDIATE HARM TO PLAINTIFFS

103.    Plaintiffs fear imminent harm under SB 4, including, but not limited to: draining of limited resources; the restriction of protected speech; the threat of hefty fines; the threat of removal from office; the threat of liability for constitutional violations; and the threat of racial profiling for members of WDP, LUPE, and TACHE. Unless enjoined by this Court, the civil and criminal provisions of SB 4 will impermissibly burden the constitutional rights of Plaintiffs.

## VI.    CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## DECLARATORY JUDGMENT THAT SB 4 IS UNCONSTITUTIONAL

104.    Plaintiffs incorporate all of the allegations contained in the previous paragraphs

of this complaint as though fully set forth here.

105.    Plaintiffs contend that SB 4 is unconstitutional because it violates the Supremacy Clause, Contract Clause, and the First, Fourth, and Fourteenth Amendments to the U.S. Constitution, and Section 2 of the Voting Rights Act of 1965.

106.    Defendants contend that SB 4 does not violate the U.S. Constitution or Section 2 of the Voting Rights Act of 1965.

107.    An actual controversy exists between Plaintiffs and Defendants about the constitutionality of SB 4.

108.    A judicial determination resolving this controversy is necessary and appropriate at this time.

## SECOND CAUSE OF ACTION

### SB 4 VIOLATES THE SUPREMACY CLAUSE OF THE U.S. CONSTITUTION

109.    Plaintiffs incorporate all of the allegations contained in the previous paragraphs of this complaint as though fully set forth here.

110.    SB 4 attempts and purports to regulate matters that are exclusively reserved to the federal government, because it operates in a field over which Congress has exercised exclusive authority, and because it conflicts and interferes with the implementation and enforcement of federal laws and regulations.

## THIRD CAUSE OF ACTION

### SB 4 VIOLATES THE FREEDOM OF SPEECH CLAUSE OF THE 1ST AND 14TH AMENDMENTS TO THE UNITED STATED CONSTITUTION

111.    Plaintiffs incorporate all of the allegations contained in the previous paragraphs of this complaint as though fully set forth here.

112.    SB 4 is a content-based, viewpoint restriction because it only outlaws speech that is critical of SB 4 and federal immigration enforcement and not speech that applauds SB 4 and federal immigration enforcement.

113.    SB 4 is unduly vague because it reaches and purports to prohibit speech that is protected by the Freedom of Speech Clause of the First Amendment.

114.    Section 752.0565 purports to remove from elective or appointive office individuals who "endorse a policy that materially limits the enforcement of immigration laws." This provision drastically limits Plaintiff Councilmember Saldaña's political speech and its content. The term "endorse" is unduly vague in that it reaches protected speech, and it is a viewpoint restriction that only prohibits a certain kind of speech. Councilmember Saldaña could be removed from elected office for "endorsing" the repeal of SB 4.

115.    SB 4 prohibits Plaintiffs from criticizing SB 4 and federal immigration policies and laws. Accordingly, SB 4 violates the First Amendment as applied to the States through the Fourteenth Amendment to the U.S. Constitution.

## FOURTH CAUSE OF ACTION

### SB 4 VIOLATES ACADEMIC FREEDOM RIGHTS OF THE 1ST AND 14TH AMENDMENTS TO THE UNITED STATED CONSTITUTION

116.    Plaintiffs incorporate all of the allegations contained in the previous paragraphs of this complaint as though fully set forth here.

117.    The First Amendment to the United Stated Constitution prohibits Defendants from abridging academic freedom of Plaintiff TACHE's members. TACHE asserts this right on behalf of its members.

118.    SB 4 abridges TACHE's academic freedom in that it restricts TACHE's ability to

control who teaches, who is taught, what subjects are taught, and how those subjects are taught at Texas institutions of higher education. Accordingly, SB 4 violates the First Amendment as applied to the States through the Fourteenth Amendment to the U.S. Constitution.

## FIFTH CAUSE OF ACTION

### SB 4 VIOLATES THE 4TH AND 14TH AMENDMENTS TO THE U.S. CONSTITUTION

119.    Plaintiffs incorporate all of the allegations contained in the previous paragraphs of this complaint as though fully set forth here.

120.    The Fourth Amendment provides "[t]he right of people to be secure in their persons" and protects against "unreasonable searches and seizures" without a warrant and without probable cause. U.S. CONST. amend. IV. Plaintiffs WDP, LUPE, and TACHE assert this right on behalf of their members.

121.    SB 4 compels compliance with all ICE detainers and removes the City's discretion to decide when to comply with detainers in order to ensure compliance with the Fourth Amendment. SB 4's requirement that the City comply with all ICE detainers, no matter the circumstances, would force the City to choose between the Draconian penalties of SB 4 and violations of individuals constitutional rights.

## SIXTH CAUSE OF ACTION

### SB 4 VIOLATES THE PROCEDURAL DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION

122.    Plaintiffs incorporate all of the allegations contained in the previous paragraphs of this complaint as though fully set forth here.

123.    The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citing *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). The "right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society." *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 168 (1951) (Frankfurter, J., concurring).

124.    SB 4 would force the City to deprive individuals, like the members of Plaintiffs WDP, LUPE, and TACHE, of their liberty and property interests without the constitutionally required procedural due process of law, in violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

## SEVENTH CAUSE OF ACTION

### SB 4 VIOLATES THE SUBSTANTIVE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION

125.    Plaintiffs incorporate all of the allegations contained in the previous paragraphs of this complaint as though fully set forth here.

126.    The Due Process Clause guarantees the right to justice applied consistently by police officers. SB 4 violates the due process clause because it grants total discretion to individual officers and prohibits any attempt to guide or control those officers. Plaintiffs WDP, LUPE, and TACHE assert this right on behalf of their members.

127.    SB 4 violates the Due Process Clause because it takes away the City's discretion to decide when to comply with ICE detainers in order to ensure compliance with the Due Process Clause of the Fourteenth Amendment. This withdrawal of discretion requires the City to honor detainer requests even when it concludes that doing so would violate the United States

Constitution.

128.    Additionally, several of SB 4's provisions are fatally vague and fail to give Plaintiffs notice of what exact conduct is unlawful, and therefore, SB 4 is void-for-vagueness.

129.    SB 4 forces the City to deprive individuals of their liberty and property interests without the constitutionally required substantive due process of law and is void-for-vagueness in violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

### EIGHTH CAUSE OF ACTION

**SB 4 VIOLATES THE EQUAL PROTECTION CLAUSE OF
THE 14TH AMENDMENT TO THE U.S. CONSTITUTION**

130.    Plaintiffs incorporate all of the allegations contained in the previous paragraphs of this complaint as though fully set forth here.

131.    The Fourteenth Amendment provides that no state shall deny to any person within its jurisdiction "the equal protection of the laws." Plaintiffs WDP, LUPE, and TACHE assert this right on behalf of their members.

132.    SB 4 was enacted with the purpose of discriminating against Latinos and against immigrants.

133.    State-compelled enforcement of federal immigration laws is not a compelling interest that justifies race-based discrimination.   SB 4 is not narrowly tailored, and SB 4 is not the least restrictive means of achieving the requisite government interest.

134.    There is also no rational basis for excluding the issue of immigration enforcement from any control or guidance by police chiefs, sheriffs, and other local leaders.

135.    SB 4 requires the City to single out immigrants, including those with lawful permanent residence, and imposes a broad and undifferentiated disability on immigrants alone to

seek and obtain preventive local guidance, policy, and protection from unlawful and arbitrary enforcement of laws affecting only immigrants. SB 4 prohibits all legislative, executive or judicial action at any level of local government designed to protect or even guide individual police officers in enforcing laws affecting immigrants as immigrants.

136.    SB 4's citizen reporting provision, Section 752.055, treats citizens and lawful immigrants differently, according privileges to citizens alone. There is no adequate constitutional basis for this discriminatory treatment.

137.    SB 4 requires the City to deprive individuals' equal protection of the laws in violation of the Equal Protection Clause of the Fourteenth Amendment.

## NINTH CAUSE OF ACTION

### SB 4 VIOLATES THE CONTRACTS CLAUSE OF THE U.S. CONSTITUTION

138.    Plaintiffs incorporate all of the allegations contained in the previous paragraphs of this complaint as though fully set forth here.

139.    The Contract Clause states that "[n]o State shall… pass any… [l]aw impairing the Obligation of Contracts."

140.    SB 4 interferes with the contracts of undocumented students, like Plaintiff TACHE's undocumented student members, at public institutions of higher education, who were admitted to a public institution under an implied contract that they would be permitted to complete their degree program if they complied with the academic, financial, and behavioral conditions imposed equally on all students at the institution.

## TENTH CAUSE OF ACTION

### SB 4 VIOLATES SECTION 2 OF THE VOTING RIGHTS ACT OF 1965

141.    Plaintiffs incorporate all of the allegations contained in the previous paragraphs

of this complaint as though fully set forth here.

142.    SB 4's provision for the removal from office of an elected official who is found to have violated Sec. 752.053, results in a denial or abridgment of the right to vote of plaintiffs on account of their race, color, or ethnicity, by having the effect of canceling out or minimizing their individual voting strength of Latinos in Texas.

143.    The removal of an elected official who is the preferred candidate of Latino voters, in combination with Texas Code provisions providing for the official's replacement through a decision of the governing body, does not afford Plaintiff Councilmember Saldaña and Plaintiff members an equal opportunity to participate in the political process and to elect representatives of their choice, and denies Plaintiff Councilmember Saldaña and Plaintiff members the right to vote in elections without distinction of race, color or previous condition of servitude.   Sec. 752.0565 also intentionally discriminates against Plaintiff Councilmember Saldaña and Plaintiff members on the basis of their race and national origin.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

i.       A declaratory judgment that SB 4, in its entirety, is unconstitutional;

ii.      An injunction prohibiting Defendants and their officials, employees, and agents from implementing or enforcing SB 4;

iii.     An order awarding Plaintiffs costs and attorney's fees, under the statutes cited herein, 42 U.S.C. § 1988, and any other applicable law;

iv.      Such other and further relief as this Court deems just and proper.

Dated:  June 1, 2017                                        Respectfully submitted,

**MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL FUND**
**By** *_/s/ Marisa Bono_*
Thomas A. Saenz (CA Bar No. 159430 )*
Nina Perales (TX Bar No. 24005046)
Marisa Bono (TX Bar No. 24052874)
Celina Moreno (TX Bar No. 24074754)
Andrea Senteno (NY Bar No. 5285341)*
Tanya G. Pellegrini (CA Bar No. 285186)*
110 Broadway, Suite 300
San Antonio, Texas 78205
Phone:  (210) 224-5476
Facsimile:  (210) 224-5382

*Pending pro hac vice Admission

**CITY OF SAN ANTONIO**
By: /s/ Deborah Lynne Klein
Deborah Lynne Klein
Deputy City Attorney, Litigation
SBN:11556750
Office of the City Attorney
Litigation Division
Frost Bank Tower
100 W. Houston St., 18th Floor
San Antonio, Texas 78205
(210)207-8940/(210)207-4357